**Thomas J. BRAND, individually and as the Administrator of the Estate of Ann M. Brand, deceased, Plaintiff,**

v.

**MAZDA MOTOR CORPORATION, and Mazda Motor of America, Inc., Defendants.**

**No. 95–4139–SAC.**

United States District Court, D. Kansas.

Aug. 19, 1997.

See also, 920 F.Supp. 1169.

Paul D. Post, Topeka, KS, for Plaintiff.

W. Russell Welsh, Douglas S. Laird, Stephen M. Gorny, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' motion for partial summary judgment on the plaintiff's failure to warn claims (Dk. 133); the defendants' motion for partial summary judgment on the plaintiff's punitive damages claim (Dk. 135); the defendants' motion for partial summary judgment on the plaintiff's breach of express warranty claim (Dk. 137); and the defendants' motion for partial summary judgment on the plaintiff's claim alleging a violation of Federal Motor Vehicle Safety Standard ("FMVSS") 209 (Dk. 183).[1]

The action arises from a car accident in which the plaintiff's wife, Ann Brand, was killed when the 1991 Mazda Protege she was operating collided with another car crossing the intersection of Highway 24 and Goldwater Road in Topeka, Kansas. The plaintiff alleges that his wife would have survived the accident if the front-seat occupant restraint system had not been defective. The restraint system used in the 1991 Mazda Protege had automatic torso belts, knee bolsters,[2] and manual lap belts.

The plaintiff alleges that the defendants negligently designed, manufactured, assembled, inspected, and tested the occupant restraint system in the 1991 Mazda Protege; that this occupant restraint system was unreasonably dangerous as a result of a design defect and failure to warn; that the restraint system breached both express and implied warranties, and that the defendant negligent-ly failed to warn. The plaintiff also seeks punitive damages based on the following allegations: (1) that the defendants were aware or should have been aware of the "high incidence of non-use of the manual lap belts;" (2) that the defendants had learned "that wearing the passive shoulder harness alone (without the manual lap belt) was an increased risk to vehicle occupants;" and (3) that the defendants' failure to warn about this increased risk under the circumstances was "willful and wanton."

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine

---

1. The defendants filed five separate motions for partial summary judgment with each devoted to a different claim. With the exception of the allegations concerning FMVSS 209, the plaintiff's other four claims had been fully pleaded, and the defendants understood them to be pending as of July 22, 1996, the filing deadline for dispositive motions. In filing four separate motions for partial summary judgment and accompanying memoranda, the defendants were able to submit supporting memoranda totalling seventy-six pages and reply memoranda totalling forty-four pages. When considered as a group, the defendants' filings and, consequently, the plaintiff's filings exceed the page limitations imposed in the court's scheduling order (Dk. 30, p. 4). The court's time was wasted in reading these separate filings, for there was substantial duplication and overlap of factual background and

arguments in them. Moreover, the court believes such a practice of separate filings violates the spirit of the page limitations. The court modified its Civil Procedural Guidelines as of January of 1997 to clarify its position:

No attempt shall be made to circumvent the page limitations established by the court through the piecemeal filing of motions or by the filing of supplemental memoranda not advancing new authority.

While it shall consider each of the defendants' separate motions, the court does not condone this motion practice for the reasons stated above.

2. A knee bolster is a structural system built into the car's lower instrument and dash panels that absorbs energy during accidents.

issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural short-cut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986),

cert. denied, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS [3]

1. On or about June 28, 1991, the plaintiff Thomas Brand and/or his wife, Ann Brand, purchased a 1991 Mazda Protege from Gary Hardy Mazda in Topeka, Kansas.

2. Ann Brand made the decision to purchase the Mazda Protege. The window sticker on this Mazda said the car was equipped with a "motorized front passive restraint system."

3. The 1991 Mazda Protege was equipped with a driver-side occupant protection system that consisted of an automatic torso (or shoulder) belt and a knee bolster. The system was supplemented with a manual lap belt.

4. The owner's manual identified the separate manual lap belt and warned that "to provide sufficient restraint, always fasten the lap belt." Ann Brand knew that the occupant protection system in the Mazda Protege was supplemented with manual lap belts.

5. Thomas Brand testified that Ann always fastened the supplemental manual lap belts and that he could not remember a time when she did not use them. Thomas also testified that Ann insisted that he use the lap belts too. Thomas said that Ann believed in using lap belts "for safety."

6. Around 7:00 p.m. on June 3, 1993, Ann Brand was driving the 1991 Mazda Protege on the eastbound lane of Highway 24 in Topeka, Kansas. At the intersection of Highway 24 and Goldwater, a car operated by Robert Longyear crossed in front of Brand's Mazda causing a collision. At the time of the accident, Ann Brand had failed to fasten the supplemental manual lap belt. Ann Brand died as a result of this collision.

7. Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act") for the purpose of "reduc[ing] traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101.[4]

---

**3.** The above will serve as the statement of uncontroverted facts for all four of the pending motions for partial summary judgment.

**4.** In 1994, this Act was recodified from Title 15 to Title 49 of the United States Code.

The Safety Act requires the Secretary of Transportation to "prescribe motor vehicle safety standards" that are "practicable [and] meet the need for motor vehicle safety." 49 U.S.C. § 30111(a). The Secretary delegated this authority to the National Highway Transportation Safety Administration ("NHTSA") which promulgated Federal Motor Vehicle Safety Standards ("FMVSS" or "safety standards").

8. Occupant crash protection is covered at FMVSS 208. As amended in 1984, FMVSS 208 required, in part, "automatic protection systems" to be introduced in the front seats of passenger cars and to be phased in over a four-year period (model years 1987–1990). While it did not specify the particular type of occupant protection system that had to be installed, FMVSS 208 at S4.1.2.1 did require of the "frontal/angular automatic protection system" that:

(a) ... each front outboard designated seating position meet the frontal crash protection requirements of S5.1 by means that require no action by vehicle occupants;

(b) ...; and

(c) [the vehicle] Either (1) Meet the lateral crash protection requirements of S5.2 and the rollover crash protection requirements of S5.3 by means that require no action by vehicle occupants; or (2) At each front outboard designated seating position have a Type 1 or Type 2 seat belt assembly that conforms to Standard No. 209 and S7.1 and S7.3 and that meets the requirements of S5.1 with front test dummies as required by S5.1, restrained by the Type 1 or Type 2 seat belt assembly (or the pelvic portion of any Type 2 seat belt assembly which has a detachable upper torso belt) in addition to the means that require no action by the vehicle occupant.

49 C.F.R. § 571.208 (1991). Thus, a system is "automatic" if it "meet[s] the frontal crash protection requirements ... by means that require no action by vehicle occupants." *Id.*

9. The design of the occupant protection system comprised of motorized torso belts and knee bolsters and found in the 1991 Mazda Protege is "automatic" within the terms of FMVSS 208, S4.1.2. and meets those requirements.[5] The presence of supplemental manual lap belts does not change or preclude the "automatic" classification of the occupant protection system under FMVSS 208.

10. In cars with automatic torso belts and manual lap belts, FMVSS 208 required both visual and audible warnings about the need to fasten the lap belt. Mazda Motor Corporation met these warning requirements of FMVSS 208 in the manufacturing of Ann Brand's 1991 Mazda Protege. The car warned Ann Brand to fasten the lap belt in each of the following ways: a dash icon light, an audible warning when the lap belt was not fastened, a written warning on the sun visor, and instructions in the owner's manual.

11. In FMVSS 209, S4.1(b), it states that "[a] seat belt assembly shall provide pelvic restraint ... and the pelvic restraint shall be designed to remain on the pelvis under all conditions...." These are design criteria, not performance standards.

12. As provided in FMVSS 208, a manufacturer may install an automatic belt "that requires no action by vehicle occupants ... to meet the crash protection requirements of any option under S4. and in place of any seat belt assembly otherwise required by that option." 49 C.F.R. § 571.208, S4.5.3. In addition, FMVSS 208 S4.5.3.4 provides:

An automatic belt furnished pursuant to S4.5.3 that is not required to meet the

---

**5.** The plaintiff does not effectively controvert this statement. The affidavit of Jeffrey Miller, former chief counsel and deputy administrator to the National Highway Traffic Safety Administration ("NHTSA"), fully supports this statement. The plaintiff does not cite any deposition testimony of Miller that contradicts this affidavit. As for the deposition testimony of Louis D'Aulerio, the plaintiff has not submitted all of the pages cited in his response. (Dk. 162, *Compare* p. 5, ¶ 4 with Ex. B). Of the pages from D'Aulerio's deposition that the plaintiff did attach, none controvert Miller's affidavit on this point. In his recent affidavit, D'Aulerio avers the occupant protection system in the 1991 Mazda Protege violates FMVSS 208, S4.5.3, in that it requires an occupant to either fasten the lap belt or move the seat forward so that the occupant's knees are close to the instrument panel. For reasons discussed later, the court rejects D'Aulerio's opinion in this regard.

perpendicular frontal crash protection requirements of S5.1 shall conform to the webbing, attachment hardware, and assembly performance requirements of Standard No. 209.

By implication, automatic seat belts that meet the frontal crash protection requirements of·S5.1 are not required to meet the requirements of FMVSS 209.

13. The driver's lap belt in the 1991 Mazda Protege was capable of being positioned on an occupant's pelvis ·and was capable of remaining there during a collision.

## FAILURE TO WARN CLAIMS

In his first amended complaint, Thomas Brand asserts claims for failure to warn sounding in strict liability (count two) and negligence (count three). Specifically, the plaintiff alleges: (1) that the defendants failed to warn users of the dangerous restraint system provided in the Mazda Protege, and (2) that the defendants failed to give an adequate and reasonable warning to users about the known risks in wearing the automatic or passive torso belt without the manual lap belt.[6]

The defendants seek summary judgment on ·these claims arguing that Ann Brand knew her Mazda Protege included a manual lap belt and knew the safety purpose for wearing it. She regularly wore the lap belt and warned others to do the same. Because Ann Brand knew these facts, the defendant argues it had no duty to warn her of the specific risks associated with failing to wear the lap belt. Given Ann Brand's knowledge and her own failure to wear her lap belt on this one occasion, the defendants contend there is no factual basis for a failure to warn claim.

From the deposition testimony of his expert on crashworthiness, Louis A. D'Aulerio, the plaintiff cites a portion where D'Aulerio opines that the warnings on the sun visors are "contradictive and confusing, . . . [and] misleading." D'Aulerio construes the group of warnings found on the visors and in the owner's manual as conveying a message that

wearing lap belts is optional with the user. The plaintiff cites different National Highway Traffic Safety Administration ("NHSTA") reports and other studies as indicating that the use of manual lap belts is low when automatic torso belts are present. In addition, the plaintiff points to the testimony of his bio-mechanics expert, Dr. Anthony Sances, where he concludes from the different studies that occupants protected only by automatic torso belts and knee bolsters sustained more liver injuries. The plaintiff argues from these opinions that the warnings fail to underscore the importance and necessity of wearing a lap belt for full protection and the specific life-threatening injuries at risk with not wearing one.

In reply, the defendants insist it is enough that Ann Brand knew the lap belts were to be worn for safety reasons. The defendants say it is irrelevant whether she knew or was warned about the particular type of injury at risk. Because Ann knew the safety purpose for the lap belt, the defendants reject likewise as irrelevant the plaintiff's argument that the defendants should have known that users would forget to use the lap belts. The defendants further highlight the different warnings—icon light, audible warning, sun visor warning and instructions in owner's manual—given to Ann Brand that apparently induced her to wear a lap belt regularly. Finally, the defendants ask the court to reject D'Aulerio's opinions about the warnings arguing D'Aulerio is not an expert in human factors and his opinion is nothing more than lay opinion.

In Kansas, a failure to warn claim, whether couched in negligence or strict liability, employs the same measure of reasonableness under the circumstances. *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1099 (10th Cir.1991); *Richter v. Limax Intern., Inc.,* 822 F.Supp. 1519, 1521 (D.Kan.1993), *rev'd on other grounds,* 45 F.3d 1464 (10th Cir. 1995); *Miller v. Lee Apparel Co.,* 19 Kan. App.2d 1015, 1029, 881 P.2d 576, *rev. denied,* 256 Kan. 995 (1994); *see Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 57, 661 P.2d 348 (1983)

---

**6.** As revealed in the plaintiff's brief, the plaintiff's warning claims concern the failure to warn in reasonably unambiguous terms of the need to

· wear the manual lap belt and the failure to warn about the specific serious risks from wearing only the automatic torso belt.

(quoting *Russell v. G.A.F. Corp.*, 422 A.2d 989, 991 (D.C.App.1980)). Though without defect in its design or manufacturing, a product may still be defective if it lacks adequate warnings of its dangerous characteristics. *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181 (10th Cir.1995). Consequently, a product may be defective if there is either a complete failure to warn of a particular risk or if the warnings given are insufficient.

Kansas law does not recognize a duty to warn, however, when the user already knows of the danger. *Mays v. Ciba–Geigy Corp.*, 233 Kan. at 60, 661 P.2d 348. " 'There is no duty to warn of dangers *actually known* to the user of a product, regardless of whether the duty rests in negligence ... or on strict liability.' " *Long v. Deere & Co.*, 238 Kan. 766, 773, 715 P.2d 1023 (1986) (quoting *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 639–40, 549 P.2d 1383 (1976)). The Kansas Supreme Court in *Long* quoted the following:

> "It would seem to be an obvious truism to state that there is no duty on the part of a manufacturer or seller to give a warning of a product-connected danger where the person who claims to be entitled to the warning *actually knows* of the danger. The case law also clearly supports the view that a person is not entitled to be warned about something he already knows."

238 Kan. at 773, 715 P.2d 1023 (quoting 63 Am.Jur.2d, *Products Liability* § 341).

Trying to avoid summary judgment based on Ann Brand's actual knowledge, the plaintiff argues the defendants had a duty to warn of the possibility of severe liver and abdominal injuries. The plaintiff denies there is any evidence that Ann Brand knew that an occupant wearing only a torso belt in a frontal collision was more likely to suffer such kinds of injuries than an occupant wearing a torso belt and a lap belt in the same accident.

The court agrees with the defendants that the "plaintiff's analysis is too narrow." (Dk. 170, p. 2). If such were the law, not only would the actual knowledge exception rarely apply, but manufacturers would face the unreasonable and probably impossible burden of warning consumers about every conceivable injury that could result from use and misuse of its product. In some circumstances, like where no serious injury is apparent from use or misuse, additional detailed warnings that explicitly identify injuries or risks may be appropriate. Considering the vast public information disseminated on the need to wear seat belts, it is a matter of common knowledge that occupants not wearing seat belts can be severely injured in car accidents. *See Marshall v. Ford Motor Co.*, 446 F.2d 712, 715 (10th Cir.1971) (Oklahoma law). The effectiveness of seat belt warnings would be compromised, if they were required to list all possible injuries under each possible accident scenario. It is enough that the warning gives general notice of the danger and the conduct to be avoided.

The record here amply demonstrates that Ann Brand knew the manual lap belts were there for her safety and that of the occupants. She apparently considered them so important to safety that she wore them "always" and even insisted on her loved ones wearing them also. Thomas Brand testified:

Q. What was her [Ann's] practice, let's say when she bought the car, in terms of using the seat belt? Was she a seat belt user sometimes, all the time, never?

A. Always. She would make everybody buckle up. Herself and everybody that was in the car had to buckle up.

(Dk. 133, Ex. E, p. 45). The only fair inference from this evidence is that Ann Brand actually knew the manual lap belts were important to her safety, i.e. would protect her from some serious injuries in the event of a car accident. The plaintiff does not argue a competing inference from this evidence and does not offer any evidence to sustain one.[7]

---

7. In *Long*, it was enough that the plaintiff testified he was not aware of "the extreme danger of injury or death in the event of a roll over if the unit [crawler loader] was equipped with a ROPS [roll-over protective structure] and a seat belt was not being used." 238 Kan. at 772, 715 P.2d

1023. Unlike *Long*, this case does not involve a unique vehicle. "The operation of a crawler loader is far different from the everyday operation of an automobile on the highways." 238 Kan. at 774, 715 P.2d 1023. Unlike an automobile where the use of seat belts is always recom-

The plaintiff has not laid any foundation for the admissibility of D'Aulerio's opinions concerning the adequacy of the sun visor warnings and the instructions in the owner's manual. Moreover, D'Aulerio's interpretations of the different warnings are strained and not couched within accepted and relevant analysis of human factors. Based on the evidence of record, the only fair inference is that all four warnings—icon light, audible warning, sun visor warnings and the instructions in the owner's manual—functioning as a group, were an adequate warning of the importance of wearing the manual lap belt. The mere fact that Ann Brand failed to wear her lap belt apparently this one time does not controvert this warning. The defendants are entitled to summary judgment on the plaintiff's failure to warn claim.

## EXPRESS WARRANTY CLAIM

The plaintiff rests this claim on the fact that the window sticker on the 1991 Mazda Protege said the car was equipped with a "motorized front passive restraint system." The plaintiff alleges the restraint system was "only partially passive" in that it required the driver to either buckle the manual lap belt or move the seat to the far forward position.

The defendants seek summary judgment on this claim arguing: (1) the plaintiff is unable to prove this interpretation of "passive," as used on the window sticker, was a basis of Ann Brand's decision to purchase the 1991 Mazda Protege; (2) the window sticker correctly described the restraint system as "passive;" and (3) the plaintiff is unable to prove that any alleged breach of this warranty stated was the proximate cause of any injury to Ann Brand.

An express warranty arises when the seller makes an "affirmation of fact ... to the buyer which relates to the goods and becomes part of the basis of the bargain...." K.S.A. 84–2–313. Official Uniform Commercial Code ("UCC") comment three to this section states:

> 3. The present section deals with affirmations of fact by the seller, descriptions

of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

K.S.A. 84–2–313, Official UCC Comment, ¶ 3. Kansas comment four to this section summarizes the Kansas case law on the basis-of-the-bargain requirement:

> Under this section, a representation by the seller must become "part of the basis of the bargain" before it creates an express warranty. This requirement is the Article 2 counterpart to the pre-Code requirement of reliance, but is much less stringent. The buyer need not show any specific or particular reliance. (citations omitted). The buyer must, however, know of a representation prior to purchase for it to become part of the basis of the bargain. (citations omitted).

K.S.A. 84–2–313, Kansas Comment, ¶ 4 (1996).

■ The court has no difficulty believing that a reasonable jury could find that the window sticker's list and description of the car's features were part of the basis of the bargain. The plaintiff need not prove any specific or particular reliance on these affirmations of fact. The defendants do not come forth with any "clear affirmative proof" for taking the affirmations found on the window sticker out of the agreement.

It is, however, another matter entirely whether the plaintiff's current interpretation of "motorized front passive restraint sys-

mended, the operator of a crawler loader was not advised to wear seat belts unless it was equipped with ROPS. 238 Kan. at 770, 715 P.2d 1023. Consequently, the operator's general

knowledge of seat belts in *Long* did not establish his knowledge of the specific risks with not wearing seat belts when the crawler loader was equipped with ROPS.

tem," as one free of manual lap belts, ever became a basis of the bargain. [8] The torso belts in the Mazda were passive because they were automatic and motorized. The window sticker did not list the lap belts as part of the passive system. The owner's manual identified the manual lap belts. For that matter, it would have been readily apparent to any front-seat occupant that the lap belts were not motorized or passive but required an occupant's activation. Moreover, the court finds nothing of record from which one could reasonably infer that Ann Brand believed near the time of purchase that her Mazda did not have *manual* lap belts. Rather, the evidence is that Ann always wore her manual lap belts and believed them important for her safety. For the nearly two years that Ann owned and drove the Mazda, she never complained about the occupant restraint system or the manual lap belts. No reasonable jury could find from this record that plaintiff's current interpretation of "motorized passive restraint system," as one free of manual lap belts, was ever a basis of the bargain. The defendants are entitled to summary judgment on this claim.[9]

## FMVSS 209 CLAIM

As part of his defective design claim, the plaintiff alleges the Mazda Protege violated the pelvic restraint requirements of FMVSS 209. The plaintiff banks this allegation on the following provision from FMVSS 209 S4.1(b), which provides:

A seat belt assembly shall provide pelvic restraint whether or not upper torso restraint is provided, and the pelvic restraint shall be designed to remain on the pelvis under all conditions, including collision or roll-over of the motor vehicle.

Focusing exclusively on the automatic torso belt and knee bolster, and ignoring the manual lap belt, the plaintiff claims the front occupant protection system in the 1991 Mazda Protege did not provide pelvic restraint to Ann Brand during the collision in violation of FMVSS 209 S4.1(b). The defendants say their system complies with FMVSS 208 and, therefore, is exempt from the requirements in FMVSS 209. Alternatively, the defendants say the manual lap belt satisfies the pelvic restraint requirements of FMVSS 209.

In response, the plaintiff argues the defendant's belt assembly did not comply with FMVSS 208, specifically S4.5.3, as it was not completely automatic but required some action taken by the occupant. In support, the plaintiff cites the affidavit of his crashworthiness expert, Louis D'Aulerio, who avers that fastening the manual lap or moving the seat forward are specific actions required of occupants that keep this system from being "an automatic belt that requires no action by vehicle occupants in order to provide crash protection." (Dk. 195, Ex. C, ¶ 4). Finally, the plaintiff again relies on Louis D'Aulerio for his opinion that "neither the automatic shoulder belt nor the knee bolster" meets the pelvic restraint requirement of FMVSS 209.

■ "FMVSS 208 outlines the seat belt options available to automobile manufacturers." *Montag by Montag v. Honda Motor Co. Ltd.,* 75 F.3d 1414, 1417 n. 1 (10th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 61, 136 L.Ed.2d 24 (1996). In relevant part, S4.5.3 of FMVSS 208 reads:

Except as provided in S4.5.3.1, a seat belt assembly that requires no action by vehicle occupants (hereinafter referred to as an "automatic belt") may be used to meet the crash protection requirements of any option under S4. and in place of any seat belt assembly otherwise required by that option.

In addition, S.4.5.3.4 of FMVSS 208 reads:

An automatic belt furnished pursuant to S.4.5.3 that is not required to meet the

---

**8.** The unstated assumption in the plaintiff's interpretation is that "system" in "motorized front passive restraint system" refers to the entire "occupant restraint system" for front seat occupants. Such an interpretation might be reasonable if the buyer did not have the actual car near the time of purchase and the presence of the manual lap belts was not so obvious or otherwise disclosed in the owner's manual.

**9.** Moreover, the plaintiff comes forth with no persuasive evidence that the front occupant protection system was not "passive." Indeed, his own crashworthiness expert, Louis D'Aulerio, has averred that "[t]he front outboard occupant restraint systems for the 1991 Mazda Protege are passive restraint systems, each consisting of an automatic motorized shoulder belt, a somewhat padded knee impact area on the lower dashboard, ..., and a manual lap belt." (Dk.195, Ex. C, ¶ 4).

perpendicular frontal crash protection requirements of S5.1 shall conform to the webbing, attachment hardware, and assembly performance requirements of Standard No. 209.

Interpreting[10] these same provisions, the Tenth Circuit in *Montag* held that automatic seat belts meeting the frontal crash protection requirements of FMVSS 208 S5.1 are "exempt from the requirements of FMVSS 209." 75 F.3d at 1417–18.

▇▇▇▇ This court is bound by the published Tenth Circuit decisions unless they have been overruled by the Tenth Circuit sitting *en banc* or superseded by a contrary Supreme Court decision. *See Haynes v. Williams,* 88 F.3d 898, 900 n. 4 (10th Cir. 1996); *United States v. Spedalieri,* 910 F.2d 707, 709 n. 2 (10th Cir.1990); *Morris v. State of Kan. Dept. of Revenue,* 849 F.Supp. 1421, 1428 (D.Kan.1994). The plaintiff not only fails to give any reason for not being bound by *Montag* but even fails to cite or discuss this binding precedent. Consequently, if the belts in the Mazda were automatic under § 4.5.3 and complied with the frontal crash requirements of S5.1, then the court must hold that the pelvic restraint requirements of FMVSS 209 do not apply.

The plaintiff argues the manual lap belt in the Mazda is not automatic under S4.5.3. This argument is wide of the mark. The plaintiff concedes the motorized torso belts in the Mazda are automatic. This seat belt assembly is automatic for purposes of S4.5.3 and the manufacturer's voluntary addition of manual lap belts does not affect the "automatic" classification given to the torso belt. The defendants have demonstrated that the automatic torso belt in the 1991 Mazda Protege satisfied the frontal crash protection requirements of FMVSS 208 S5.1. *See* Dk. 197, Exhibits A and C. Therefore, the standards of FMVSS 209 do not apply here, and the defendants are entitled to summary judgment on any claim based on a violation of FMVSS 209.

**10.** The meaning of these regulatory provisions is a matter for the court, not the jury, to decide. *Bammerlin v. Navistar Int'l Transp. Corp.,* 30

## PUNITIVE DAMAGES CLAIM

The issue is whether a reasonable jury could find from the record that the plaintiff proved by clear and convincing evidence that the defendants had acted willfully or wantonly with respect to the design of its front occupant protection system. The plaintiff premises his punitive damages claim on the allegations that the defendants were aware or should have been aware of both the "high incidence" of front seat occupants not wearing the manual lap belts along with the automatic torso belts and of the increased risk of serious injury to those occupants wearing automatic torso belts without the manual lap belt.

In seeking summary judgment, the defendants principally argue an award of punitive damages would be inappropriate as their design of the occupant protection system in the 1991 Mazda Protege complied with federal safety standards. The defendants further argue that the occupant protection system used here has been proven effective in reducing deaths and serious injuries. The plaintiff refutes any notion that compliance with federal regulatory standard immunizes a manufacturer from liability for willful or wanton acts. The plaintiff's evidence and allegations are summarized in the following quote from his brief:

> As plaintiff has demonstrated in the additional factual contentions as shown above, there were many and numerous studies which were recognized by NHTSA showing that from a usage rate standpoint, the automatic belt system with manual supplemental lap belt was the least effective of any passive, automatic system. Such studies were available as early as 1986, and continued up through 1994. Further, despite the fact that the many studies and government surveys show that air-bag usage was becoming more prevalent and that the technology was fully developed in the mid 1980's, Mazda has admitted in this case that it did not have the competence to pursue this technology. Finally, a number of studies are available

F.3d 898, 900–01 (7th Cir.1994); *Contini by Contini v. Hyundai Motor Co.,* 876 F.Supp. 540, 542 (S.D.N.Y.1995).

showing the much greater incidence of severe injuries to the liver and other abdominal organs for persons involved in frontal crashes at relatively low speed, when the manual lap belt was not fastened. Numerous studies, many cited by NHTSA in its several reports to Congress, all show that there was a high incidence of non-use of the manual lap belt portion of this so called automatic system.

(Dk. 162, p. 16). In short, the plaintiff says the defendants' compliance with FMVSS 208 should not preclude punitive damages when the defendants acted wantonly in supplying manual lap belts, in that, they were aware of the low use of manual lap belts with the automatic torso belts, knew of the trend towards air bags and their own lack of expertise with that technology, and knew of studies showing increased risk of serious liver and abdominal injuries from the use of the automatic torso belt without the manual lap belt.

In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n,* 251 Kan. 347, 366, 837 P.2d 330 (1992); *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 72, 755 P.2d 1319 (1988). Wantonness is more than negligence or the lack of due care, but less than willfulness. *Cerretti,* 251 Kan. at 368, 837 P.2d 330. Wantonness is the mental attitude displayed when the wrongdoer realizing his acts of commission or omission place others in imminent danger or risk of injury fails to prevent such injury because of indifference to whether the injury occurs. *Cerretti,* 251 Kan. at 367–368, 837 P.2d 330 ("An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act."); *Folks,* 243 Kan. at 72, 755 P.2d 1319. " 'Punitive damages . . . remain as the most effective remedy of consumer protection against defectively designed mass produced articles. They provide a motive for private individuals to enforce rules of law and enable them to recoup the expense of doing so.' " *Tetuan v.*

*A.H. Robins Co.,* 241 Kan. 441, 481–82, 738 P.2d 1210 (1987) (quoting *Grimshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 810, 174 Cal. Rptr. 348 (1981)).

By statute, Kansas law requires a plaintiff to prove by clear and convincing evidence that a defendant acted toward the plaintiff with willful or wanton conduct. *See* K.S.A. 60–3701(c). "Clear and convincing evidence means evidence that is certain, unambiguous, and plain to the understanding and so reasonable and persuasive as to cause the jury to believe it." *Cerretti,* 251 Kan. at 367, 837 P.2d 330. In defending against summary judgment, the plaintiff may not rest on mere allegations or denials in his pleadings. *Whittenburg v. L.J. Holding Co.,* 830 F.Supp. 557, 565 (D.Kan.1993). Rather, the plaintiff must come forth with proper Rule 56 evidence of clear and convincing quality from which a reasonable jury could find that the defendant acted wantonly in designing and manufacturing the front seat occupant protection system in the 1991 Mazda Protege.

The Kansas Product Liability Act provides that:

> (a) When the injury-causing aspect of the product was, at the time of manufacture, in compliance with legislative regulatory standards or administrative regulatory safety standards relating to design or performance, the product shall be deemed not defective by reason of design or performance, . . ., unless the claimant proves by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions.

Consequently, compliance with federal regulatory standards "is not dispositive under Kansas law if a reasonable manufacturer would have done more." *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1446 (10th Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). Nor does compliance with federal regulatory standards cut off liability for punitive damages when the plaintiff is able to prove by clear and convincing evidence that the manufacturer still acted with "reckless indifference to consumer safety." *Id.*

In *O'Gilvie*, the Tenth Circuit found "abundant evidence" that the defendant manufacturer had "deliberately disregarded studies and medical reports" showing increased risks with the "high-absorbency" of its product at a time when other manufacturers were modifying or withdrawing their "high-absorbency" products in response to these studies and reports. 821 F.2d at 1446. The defendant manufacturer also profited by advertising this high-absorbency feature when others were reducing absorbency and when it knew the absorbency rate greatly exceeded what was needed for effectiveness. 821 F.2d at 1446.

■ In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387 419, 681 P.2d 1038, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), the Kansas Supreme Court found the following to be sufficient evidence for submitting the issue of punitive damages to the jury:

> We conclude that there was scientific and medical evidence tending to show that vessel wall damage, acute renal failure, malignant hypertension and HUS ["hemolytic uremic syndrome"] were extremely serious dangers which were associated with Ortho's product; that Ortho chose to ignore the accumulating medical and scientific evidence; that Ortho did not pursue the additional research which the data suggested; and that Ortho continued to urge the use of its higher estrogen preparations, played down the danger of those products and gave physicians no warning of the dangers involved. From this evidence, the jury could have found that Ortho was grossly negligent and recklessly indifferent to the rights of others, including this plaintiff.

Drawing first from *O'Gilvie, Folks*, and *Wooderson* and considering also the case law from other jurisdictions, the court considers the following to be the common key indicia of a manufacturer's reckless disregard for consumer safety: (1) the defendant manufacturer was aware that its product had a defect and that the defect posed a risk of imminent injury to product users; (2) the defendant manufacturer was capable of either correcting the defect or preventing injury from the defect; and (3) despite its knowledge and capability, the defendant manufacturer deliberately or recklessly failed to either correct the defect or prevent the injury. *See Johnson v. General Motors Corp.*, 889 F.Supp. 451, 454 (W.D.Oka.1995); *Thiry v. Armstrong World, Ind.*, 661 P.2d 515, 518 (Okla. 1983).

■ Based on its review of the evidence of record cited and submitted by the parties, the court concludes that a reasonable jury could not find the defendants to have acted in reckless disregard of consumer safety in designing and manufacturing the front occupant protection system. As shown above, the automatic torso belt and the knee bolsters satisfy the requirements of FMVSS 208 and exempt this system from the requirements of FMVSS 209. The defendants, however, supplemented the front occupant protection system with manual lap belts that exceeded the requirements of FMVSS 208 and that satisfied the requirements of FMVSS 209. While the plaintiff continues to emphasize that the FMVSS are minimum standards, he has failed to show that the defendants' efforts ended after compliance with these minimums.

The plaintiff alleges the defect is that the automatic torso belt can be worn without the manual lap belt and that the defendants knew there was a high incidence of this occurring. The plaintiff alleges the defendants knew or should have known that occupants wearing only the automatic torso belts in frontal collisions frequently suffered serious liver lacerations or other abdominal injuries. The plaintiff points to one or more studies released in 1992 or before as showing that the percentage of drivers torso belts who also buckled their manual lap belts was lower than the drivers using manual three-point belts. (Dk. 162, Ex. D, p. 15). The plaintiff, however, fails to identify any studies or reports released in 1992 or before showing that occupants wearing only automatic torso belts were more likely to suffer liver lacerations or abdominal injuries. All of the studies cited by the plaintiff were published in 1994 or later. Other than through these later studies and articles, the plaintiff does not attempt to prove that the defendants

were aware in 1991 or 1992 of this increased risk of liver injury from wearing only automatic torso belts in frontal collisions. Without such evidence or proof, the plaintiff is not entitled to present his claim of punitive damages to the jury.

The plaintiff has not come forth with evidence that the defendant manufacturer was capable of correcting the defect or preventing injury from the defect. Having had his air bag claim dismissed earlier on preemption grounds, the plaintiff cannot argue now that the defendants should have installed an automatic system that included an air bag. Nor can the plaintiff seek punitive damages based on the defendants' lack of effort or competence with air-bag technology. Except for systems involving air bags, the plaintiff does not identify or demonstrate any other occupant protection system that is more effective than the one used in the Mazda Protege. In fact, the defendants' expert has averred than this occupant protection system is the "most effective seat belt system," (Dk. 135, Ex. C, ¶ 10, "This is because these systems combine good performance and high usage.") The principal NHSTA study from 1992 cited by the plaintiff appears to substantiate the defendant's expert. (Dk. 162, Ex. D, pp. ix, xiii; Dk. 135, Ex. D). Nor does the plaintiff offer any evidence that in 1991 or 1992 other car manufacturers were moving away from this protection system in favor of something other than air bags.

On the record as it now stands, no reasonable jury could find that the defendants deliberately or recklessly failed to either correct a defect or prevent an injury. The defendants were using an occupant protection system that met and exceeded federal safety standards. This was the same system that many manufacturers were installing at that time. (Dk. 135, Ex. B, ¶ 5). Other car manufacturers using this same system included Ford, Chrysler, General Motors, Honda, Nissan, Toyota, Mitsubishi, Saab and Jaguar. (Dk. 135, Ex. C, ¶ 4). The court finds that the defendants are entitled to summary judgment on the plaintiff's punitive damages claim.

IT IS THEREFORE ORDERED that the defendants' motion for partial summary judg-ment on the plaintiff's failure to warn claims (Dk. 133) is granted;

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment on the plaintiff's punitive damages claim (Dk. 135) is granted;

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment on the plaintiff's breach of express warranty claim (Dk. 137) is granted; and

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment on the plaintiff's claim alleging a violation of Federal Motor Vehicle Safety Standard ("FMVSS") 209 (Dk. 183) is granted.